**CONCRETE SURFACE INNOVATIONS, INC.,**

                **Plaintiff,**

**-vs-**                          **Case No.  6:10-cv-568-Orl-28GJK**

**MICHAEL McCARTY and SPRING CLEANING, INC. d/b/a SCI Floors a/k/a SCI Floors, Inc.,**

                **Defendants.**

---

# ORDER

Plaintiff, Concrete Surface Innovations, Inc. ("Concrete"), has filed the instant action against one of its former employees, Michael McCarty ("McCarty"), and McCarty's current employer, Spring Cleaning, Inc. d/b/a SCI Floors a/k/a SCI Floors, Inc. ("Floors").  In the Amended Complaint, Concrete seeks injunctive relief and damages against Defendants based on, inter alia, the alleged violation by McCarty of a non-competition agreement he signed when he became an employee of Concrete.

This case is currently before the Court on Plaintiff's Motion for Preliminary Injunction (Doc. 17).[1]  The Court heard argument on the motion on May 4, 2010, and now issues the following ruling thereon.

## I.  Background

As described in the affidavit of its vice-president, Concrete "specializes in concrete

---

[1]This motion supersedes the "Motion for Emergency Preliminary Injunction" (Doc. 6) that was filed in state court prior to removal of the case to this Court.  The earlier-filed motion (Doc. 6) shall be denied as moot.

repair and finishing, including control joints, spalls and use of polyurea and epoxy products for caulking, in addition to resurfacing, painting and staining of concrete on commercial and industrial projects." (Aaron Rosenmund Aff., Doc. 14, ¶ 2). Concrete seeks and places bids for, inter alia, projects involving renovation of concrete floors at Wal-Mart and Sam's Club stores. (Id. ¶¶ 3, 4, & 8; see also McCarty Aff., Ex. 1 to Doc. 19, ¶ 3). In bidding on such projects, Concrete and its competitors submit bids to general contractors for part or all of the floor work, and the overall project is awarded to one of the general contractors.

McCarty became an employee of Concrete on June 5, 2009. While he was employed by Concrete, McCarty's "job was to perform concrete floor repair and refinishing and supervise other employees engaged in the same activities. (McCarty Aff. ¶ 2). In December 2009, McCarty resigned from Concrete. (See Ex. 9 to Doc. 13). Sometime shortly thereafter, McCarty became employed by Floors. As a Floors employee, McCarty has "responsibility for acting as foreman supervising employees doing concrete floor repair and refinishing." (McCarty Aff. ¶ 1). It is undisputed that while he has been employed by Floors, McCarty has worked on two Wal-Mart or Sam's Club projects in Florida—one in Orlando and one in Port Charlotte. (See, e.g., id. ¶¶ 8-9).

When McCarty became employed by Concrete, he signed a Non-Competition Agreement ("the Agreement"). (Ex. 2 to Doc. 13). In the Agreement, McCarty agreed that for three years after termination of his employment with Concrete, he would not "engage or have any interest, as an owner, employee, representative, agent, independent contractor, subcontractor, consultant or otherwise, in any business which is similar to the commercial and retail business conducted by [Concrete] within a fifty (50) mile radius of [Concrete's]

main office and any satellite office or [Concrete] project." (Id. at 1). McCarty also agreed that during the three-year post-termination period he would "not solicit [or] employ any person who is or was employed by" Concrete and would "not solicit, contact, or respond to requests for services from [Concrete's] present, former or prospective customers or clients." (Id.). The Agreement also barred McCarty from using or disclosing "Confidential Information" as defined therein. (Id. at 2).

Sometime after McCarty resigned from Concrete, Concrete learned from one of its materials suppliers, Metzger-McGuire, that McCarty had contacted Metzger-McGuire seeking to purchase materials for use in concrete floor repair. (Rosenmund Aff. ¶ 12). On February 18, 2010, Concrete, through counsel, sent a letter to McCarty that stated in part as follows:

> It has been discovered that you are and have been violating your Non-Competition Agreement . . . . The Agreement you executed, which constituted material consideration for your employment by [Concrete], precludes you from working for its competitors for a period of three (3) years from the date of your resignation, or until December 11, 2013. . . .
> It has come to [Concrete's] attention that you are engaged for yourself and/or on behalf of others in contacting customers and others with which [Concrete] enjoys a substantial relationship. In your Non-Competition Agreement, you recognized [Concrete's] legitimate business interests and trade secret or confidential information, and promised to avoid any post-employment infringement whatsoever.

(Letter from Hayes to McCarty, part of Ex. 7 to Doc. 13, at 1). The letter demanded that McCarty cease and desist violating the Agreement. (Id.). Concrete's counsel also sent a letter that same day to Floors regarding McCarty, the Agreement, and the alleged breaches of the Agreement; that letter asked Floors to cease and desist violations of the Agreement. (Letter from Hayes to Floors, part of Ex. 7 to Doc. 13).

Concrete filed this suit against McCarty and Floors in state court on March 2, 2010, (Doc. 2), and the next day Concrete filed a "Motion for Emergency Preliminary Injunction" (Doc. 6). After two hearings were held on that motion in state court and a third hearing was scheduled, Defendants removed the case to this Court. (Notice of Removal, Doc. 1). This Court scheduled a hearing on the issue of preliminary injunctive relief as soon as the notice requirements of the Local Rules allowed,[2] and Concrete was directed to file a new motion that complied with the Local Rules. (Order, Doc. 11). Concrete filed a new motion (Doc. 17) and submitted evidence in support thereof, and Defendants filed a Response (Doc. 19) and evidence of its own. As earlier noted, the Court heard oral argument on Concrete's motion on May 4, 2010.

## II. Discussion

### A. Preliminary Injunction Standard

"A district court may grant injunctive relief only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." Siegel v. Lepore, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). "'A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly carries the burden of persuasion as to

_____

[2]Local Rule 4.06(a) provides that "[a] preliminary injunction may not be issued absent notice, which must be given at least fourteen (14) days in advance of the hearing." (Citations omitted).

-4-

the four requisites.'" <u>All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.</u>, 887 F.2d 1535, 1537 (11th Cir. 1989) (quoting <u>United States v. Jefferson County</u>, 720 F.2d 1511, 1519 (11th Cir. 1983)) (internal marks omitted).  In the instant case, Concrete seeks to enforce its noncompetition agreement under section 542.335, Florida Statutes, which provides in part that "[a] court shall enforce a restrictive covenant by any appropriate and effective remedy, including, but not limited to, temporary and permanent injunctions."  § 542.335(1)(j), Fla. Stat.

### B.  The Merits of Concrete's Motion

In their response to Concrete's motion, Defendants argue that Concrete has not established that McCarty has violated the terms of the Agreement and that Concrete has not identified a protectable "legitimate business interest" in any event.  As set forth below, the Court agrees.

### 1.  Violation of the Agreement

The Agreement contains two main restrictions:  a restrictive covenant, which in turn has three subcomponents; and a bar on disclosure of confidential information.  (<u>See</u> Agreement at 1-2).  Concrete has not established a likelihood of success on its claim that McCarty has violated any of these restrictions.

### a.  "No Competition"

The first subcomponent of the restrictive covenant in the Agreement is the "no competition" provision, which precludes McCarty from competing with Concrete—as an employee or otherwise—for a period of three years after his separation from employment with Concrete.  Although this provision is the one that Concrete comes closest to

establishing violation of—it is, after all, undisputed that McCarty is engaged in the same type of employment that he performed while working for Concrete—this provision is limited in geographic scope to a fifty-mile radius of Concrete's "main office and any satellite office or . . . project," and Concrete has not presented any evidence that McCarty has competed within fifty miles of any of these places.

The only office of Concrete that has been identified is in Jacksonville, Florida. (See McCarty Aff. ¶ 9). No evidence as to a location of a satellite office or project of Concrete has been presented. The only projects that McCarty has worked on for Floors of which there is record evidence are in Orlando, Florida, and Port Charlotte, Florida—both of which are more than fifty miles from Jacksonville.

During oral argument, Concrete's counsel was questioned as to whether there was any record evidence of competition within fifty miles as stated by the terms of the Agreement. Counsel asserted that Defendants did not "raise" the fifty-mile issue in state court, instead asserting it for the first time in their response in this Court. Counsel also argued that the evidence in the state court was that McCarty was in fact doing business within a fifty-mile radius. However, Concrete bears the burden of proof on this motion, and if Concrete intends to rely on the "no competition" portion of the Agreement—the only portion that includes the fifty-mile requirement—part of establishing a violation of that paragraph is showing that the competition occurred within fifty miles of a Concrete office or project. Concrete did not establish fifty-mile proximity. Thus, Concrete has not established a

violation of this portion of the Agreement.[3]

_____

[3]Three hours after conclusion of oral argument on the preliminary injunction hearing, Concrete filed a "Request for Judicial Notice of Location of [Floors's] Southeast Office Within 50 Miles of Plaintiff's Headquarters" (Doc. 25). In that document, Concrete asserts that "[a]ccording to Google Maps, . . . it is 44.5 miles between the main office of [Floors in Kingsland, Georgia] and the headquarters of Concrete" in Jacksonville, Florida. (Id. at 2). Concrete asks that the Court take judicial notice of this distance and conclude that a violation of the "no competition" portion of the Agreement occurred within fifty miles of Concrete's main office.

The Court rejects this request. When the Court scheduled argument on the motion, Concrete was given until Wednesday, April 21 to file and serve "all papers and affidavits upon which [it] intends to rely." (Doc. 11 at 1). This deadline was in accordance with Local Rule 4.06(b)(2), which requires that all such papers be served with the motion for preliminary injunction; as noted earlier in the text of this Order, deadlines were set as soon as practicable under the time requirements of the Local Rule in order to afford Concrete a prompt hearing after removal of the case. Concrete apparently did not submit any evidence of a fifty-mile-radius violation by the April 21 deadline, even though Concrete did submit—and this Court has considered—the evidence that was admitted during the state court proceedings prior to removal, and even though Concrete asserted during argument that the evidence in state court was that there was a fifty-mile-radius violation. To allow Concrete to rely on this late-filed evidence would not be proper; Defendants have been deprived of an opportunity to rebut it.

Moreover, even if the Court did consider this evidence and accept the representation that it is less than fifty miles between Concrete's headquarters and Floors's Georgia office, it is questionable whether a violation by McCarty could be found. The Agreement's geographic limitation does not hinge on the business address of Floors but on the place where McCarty competes with Concrete. Again, the only evidence as to McCarty's competitive activities are that he worked on projects for Floors in Orlando and Port Charlotte. The fact that Floors's office happens to be within fifty miles of Concrete's headquarters is not necessarily dispositive and indeed does not seem to be a reasonable basis for finding a violation. If, for example, the employee at issue were a salesperson with a sales territory that was more than fifty miles away from any of his former employee's operations, it would make little sense to find a violation of a non-compete agreement based only on the new employer having an office within fifty miles of the former employer. Indeed, the fact that the evidence reflects work by McCarty only more than fifty miles away from Concrete's office even though he apparently lives near Floors's Georgia office tends to show effort by McCarty to comply with the geographic terms of the Agreement. The Agreement would not be reasonably necessary to protect Concrete's interests if it were construed as barring employment by an entity with an office near Concrete where the former employee's work is performed more than fifty miles away.

b. "No Hiring of Others"

The second subcomponent of the "Restrictive Covenant" section of the Agreement bars McCarty, for a period of three years, from "soliciting" and "employing" "any person who is or was employed by" Concrete. (Agreement at 1). Concrete contends that Defendants "also solicited and now employ another of [Concrete's] employees, Andrew Lombardo." (See Rosenmund Aff. ¶ 13; see also Am. Compl. ¶ 25 (alleging that Defendants "have pirated former employees")).

However, McCarty states in his affidavit that he was contacted by a former employee of Concrete who told McCarty that he had resigned because Concrete would not give him any work assignments. (McCarty Aff. ¶ 13). McCarty referred that employee to someone at Floors with responsibility for hiring. (Id.). McCarty attests that he "played no part in the hiring decision and took no action to solicit this individual to leave his employment with" Concrete. (Id.).

The record evidence does not support a finding that McCarty solicited any Concrete employees. McCarty denies soliciting any employee, and Rosenmund's affidavit is conclusory on this point; as noted by Defendants in their memorandum, Rosenmund does not have knowledge of the circumstances leading to Lombardo's employment by Floors. There is no competent evidence that McCarty solicited Lombardo, and it was Floors—not McCarty—who employed Lombardo.[4] Floors is not a party to the Agreement between McCarty and Concrete, and thus Floors could not violate the Agreement by employing

---

[4]Lombardo has since resigned from Floors. (See McCarty Aff. ¶ 13).

Lombardo. No violation of the Agreement's "soliciting or employing of others" prohibition has been shown by Concrete.

c. "No Solicitation"

The third and final subcomponent of the "Restrictive Covenant" portion of the Agreement bars McCarty, for a period of three years, from "solicit[ing], contact[ing], or respond[ing] to requests for services from [Concrete's] present, former or prospective customers or clients or successors thereto on behalf of himself or . . . any other business or entity that provides or engages in any of the services furnished or conducted by" Concrete. (Agreement at 1-2). As will be addressed in more depth in the discussion of the "legitimate business interest" issue below, Concrete has not identified any person or entity within this provision whom McCarty "solicited, contacted, or responded to." Thus, Concrete has not established a violation of this portion of the Agreement either.

d. "Confidential Information"

In addition to the three subcomponents of the "Restrictive Covenant" portion of the Agreement, another section of the Agreement bars McCarty from, for a three-year period, using or disclosing any "Confidential Information" as defined therein to any person. (Agreement at 2). "Confidential Information" is defined in the Agreement as:

> information which is not generally known in [Concrete's] profession or industry, which has been proprietary to [Concrete] and which has been subject to efforts by [Concrete] to maintain its confidentiality, including (i) trade secret information, which includes, but is not limited to, [Concrete's] methods, processes and techniques; [and] (ii) information relating to the business, contracts and relationships of [Concrete] . . . and information about [Concrete's] customers or clients, prospective clients or markets, billings, purchasing, estimating, accounting, marketing,

selling, services, affiliates, referrals, and/or record-keeping.

(Agreement at 2).

Concrete has not established a violation of this provision or a substantial likelihood of success in establishing such a violation. McCarty states in his affidavit that to his knowledge, during the six months that he was employed by Concrete he "was not exposed to any of [Concrete's] trade secrets or confidential information related to [his] work in performing concrete repair and finishing." (McCarty Aff. ¶ 6). McCarty further states that "[w]ith two exceptions, [he] was not aware of [Concrete's] pricing strategy, bids, invitations to bid, jobs coming up for bid, customers, or any leads from material suppliers" except to the extent that he became aware of who the customer was once he was assigned to work on a project. (Id.). The two exceptions that McCarty noted were non-renovation projects; one was a restaurant for which Concrete was not awarded the bid, and the other was a residence. (Id.). Additionally, McCarty states that he has "at no time supplied any trade secret or confidential information of [Concrete] to [Floors] or any of its employees"; he "was not involved in the bid process and did not supply any information to [Floors] in connection with its bids on various Sam's Club or Wal-Mart projects around the country including those in the state of Florida specified in the Amended Complaint in Port Charlotte and Orlando"; and "[b]oth of these jobs were bid by [Floors] before [McCarty] knew that [he] would be going to work for [Floors]." (Id. ¶ 8).

Although Concrete avers in its motion that McCarty was privy to confidential information when he worked for Concrete, even accepting this proposition as true there is no evidence of McCarty disclosing any such information to Floors or anyone else. Thus,

Concrete has not carried its burden of establishing a likelihood of success on the merits of a violation of the "Confidential Information" portion of the Agreement.

### e.  Conclusion as to Violation of the Agreement

In sum, the record before the Court does not support a conclusion that Concrete has a substantial likelihood of success on the merits of its claim that McCarty has violated any of the provisions of the Agreement.  For this reason alone, Concrete's motion for preliminary injunction is due to be denied.  The Court will, however, address the issue of whether Concrete has articulated a "legitimate business interest" that is entitled to protection under the statute in any event.

### 2.  Legitimate Business Interest

Not all restrictive covenants are valid in Florida.  Indeed, the statute under which Concrete seeks to enforce the Agreement is codified in a chapter of the Florida Statutes entitled "Combinations Restricting Trade or Commerce," and post-employment restrictive covenants are a small exception to otherwise prohibited restraints of commerce.  A plaintiff seeking to enforce a restrictive covenant must "plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant. . . . Any restrictive covenant not supported by a legitimate business interest is unlawful and is void and unenforceable." § 542.335(1)(b), Fla. Stat.  The statute provides:

> The term "legitimate business interest" includes, but is not limited to:
> 1.  Trade secrets, as defined in s. 688.002(4).
> 2.  Valuable confidential business or professional information that otherwise does not qualify as trade secrets.
> 3.  Substantial relationships with specific prospective or existing customers, patients, or clients.
> 4.  Customer, patient, or client goodwill associated with:

> a. An ongoing business or professional practice, by way of trade name, trademark, service mark, or "trade dress";
> b. A specific geographic location; or
> c. A specific marketing or trade area.
> 5. Extraordinary or specialized training.

§ 542.335(1)(b), Fla. Stat.

In its filings and during oral argument, Concrete's articulation of the legitimate business interest that it seeks to protect has oscillated. Count I of the Amended Complaint—on which Concrete bases its request for preliminary injunctive relief—alleges generally that "the Agreement is reasonably necessary to protect [its] legitimate business interests," (Doc. 3 ¶ 29), and in later paragraphs mentions training that McCarty received at Concrete as well as "proprietary and trade secret information" and "direct knowledge" of invitations to bid that Concrete received, (id. ¶¶ 31-32). The general facts of the Amended Complaint also refer to Concrete having "substantial relationships" with vendors. (Id. ¶ 10). In the motion itself, Concrete refers to the "legitimate business interests" at issue as Concrete's "relationships with specific manufacturers, Metzger-McGuire and VersaFlex, specific current and prospective customers, Wal-mart and Sam's Club, in non-solicitation of other [of] its employees, [and] in specialized training, certification, technique, processes, equipment, equipment maintenance and methods, parts of which are privately developed and maintained." (Doc. 17 at 6).

During oral argument, Concrete focused mainly on the substantial relationships that it allegedly has with Metzger-McGuire and VersaFlex, two vendors of material used in the concrete repair process. Concrete asserts that the substantial relationships with these two vendors are protectable legitimate business interests under the Florida statute. However,

the Court is unpersuaded.

The statute does provide that "[t]he term legitimate business interest' includes, but is not limited, to . . . [s]ubstantial relationships with specific prospective or existing customers, patients, or clients." § 542.335(1)(b)3., Fla. Stat. Concrete attempts to fit Metzger-McGuire and VersaFlex into this "customers or clients" box, and Concrete also relies on the fact that the list of enumerated interests in the statute is not exclusive, as indicated by the "includes, but is not limited to" language. Neither of these arguments is convincing.

As explained by the parties, Metzger-McGuire and VersaFlex are manufacturers of epoxy that is used in renovations and repairs of concrete, and they are the only two manufacturers of epoxy that Wal-Mart and Sam's Club will allow the contractors that they hire to use in renovating their stores. Concrete contends that its "substantial relationships" with Metzger-McGuire and VersaFlex are protectable business interests, but as far as the Court can tell these suppliers are vendors of a product that is necessary for some jobs to be awarded but they are not akin to "clients" or "customers." Cf. Bradley v. Health Coal., Inc., 687 So. 2d 329, 334 (Fla. 3d DCA 1997) (finding that trial court erred in enjoining former employee from contacting any of former employer's suppliers and noting that the presumption of irreparable injury for "direct solicitation of customers" in version of Florida statute then in effect did not extend to "doing business with suppliers"). Indeed, as noted by Floors, Concrete is the customer or client of Metzger-McGuire or VersaFlex—not the other way around.

Concrete also argues that its "substantial relationships" with Metzger-McGuire and VersaFlex allow it to have better pricing on these vendors' products and inside

information—i.e., leads—about future work in the industry. (See Rosenmund Aff. ¶ 3). However, Concrete has not explained how McCarty leaving its employment would impact Concrete's "better pricing" or lead information from these vendors. And, though Concrete asserts that Defendants have "admitted" the allegation in the Amended Complaint that Concrete has a "substantial relationship" with Metzger-McGuire, (see Am. Compl. ¶ 17; Answer, Doc. 4, ¶ 17),[5] a "substantial relationship" with Metzger-McGuire is not the equivalent of a statutorily protected "substantial relationship"; thus, this argument is also unavailing.

Additionally, Concrete attempts to rely on "certification" from these vendors as a protectable interest, asserting that "certification" is required for concrete repairers to use Metzger-McGuire or VersaFlex products, and while he worked at Concrete, McCarty—along with other Concrete employees—became certified by Metzger-McGuire. (See Ex. 5 to Doc. 13). As earlier noted, McCarty contacted Metzger-McGuire after he left Concrete and attempted to purchase supplies. However, Metzger-McGuire declined to deal with him because the certification that Metzger-McGuire affords to repairers is only valid while the certified person works for a specific employer, (see Metzger Aff., Doc. 15, ¶¶ 4-6); McCarty's

_____

[5]In paragraph 17 of its Amended Complaint, Concrete alleges that in early February 2010, it "was contacted by a vendor with whom it has a substantial relationship regarding McCarty's efforts to purchase products only sold to certified businesses for application at projects." (Doc. 3 ¶ 17). The vendor being referred to in this paragraph is apparently Metzger-McGuire. (See Rosenmund Aff. ¶ 12). In their Answer, Defendants "admit the allegations contained in Paragraph 17 of Plaintiff's Complaint." (Doc. 4 ¶ 17). It is this statement on which Concrete bases its assertion that Defendants have "admitted" that Concrete has a "substantial relationship" with Metzger-McGuire. As noted in the text, however, even if this were deemed admitted, a "substantial relationship" is not necessarily a statutorily-protected "substantial relationship."

certification card from Metzger-McGuire expressly states: "Note: individual is certified only when working for company listed above," (Ex. 5 to Doc. 13, at 2), and a letter that Metzger-McGuire sent to Concrete with the cards advised: "You will note on the card that the employee is only certified while employed by the company with which he/she was certified," (id. at 1).

Although Concrete asserts a protectable interest in this "certification"—perhaps more properly couched as "specialized training," which is one of the enumerated interests in the statute—Concrete has not shown that protection of Metzger-McGuire certification is warranted because that certification is, according to evidence that Concrete itself submitted, only valid while an employee works for Concrete. In fact, McCarty contacted Metzger-McGuire but was unable to purchase products from them because of the employer-specific limitation in their certification. Thus, even assuming arguendo that the Metzger-McGuire certification constitutes "specialized training" within the meaning of section 542.335(1)(b)5., Concrete has not established that enforcement of the Agreement would be "reasonably necessary to protect" it. See § 542.335(1)(c), Fla. Stat.

With regard to VersaFlex certification, Defendants correctly note that VersaFlex was not pleaded as the legitimate business interest involved in this case. See § 542.335(1)(b) ("The person seeking enforcement of a restrictive covenant shall plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant."). There are other shortcomings with Concrete's reliance on VersaFlex certification as well. First, while evidence has been presented as to McCarty's receipt of Metzger-McGuire certification while employed at Concrete, there is no such clear evidence as to his receipt of

VersaFlex certification during his six-month tenure there.  Concrete has referred to a "suspicious" letter that it claims is a fabrication by Floors; that letter refers to Floors and McCarty being VersaFlex-certified in November 2009—a month during which McCarty was still employed by Concrete.  Concrete seems to assert that this is a backdated letter, and nowhere is there evidence from which the Court can ascertain when McCarty became certified by Versaflex.  Thus, even assuming that "VersaFlex certification" or "VersaFlex training" is a protectable legitimate business interest under the statute, Concrete has not established that it provided such training to McCarty.

Again, "relationships with" and "certification by" Metzger-McGuire and VersaFlex were the main "legitimate business interests" asserted by Concrete during oral argument.  To the extent Concrete attempts to rely on other, more general training that it allegedly provided to McCarty, Concrete has not met its burden of establishing that any such training was "extraordinary or specialized."  Before McCarty's six-month stint with Concrete, McCarty had worked in the industry for eight years, and he attests that was trained in concrete repair during that time—not while he worked at Concrete.  (McCarty Aff. ¶¶ 4, 7).  Under such circumstances, Florida courts have declined to find a protectable interest in training.  See, e.g., Austin v. Mid State Fire Equip. of Cent. Fla., Inc., 727 So. 2d 1097, 1098 (Fla. 5th DCA 1999) (noting that the case did not involve the issue of the receipt of "training or other specialized knowledge" where the employee had "been in the industry for sixteen years and worked for other companies . . . before going to work for" the employer with whom he entered into noncompete agreement); Passalacqua v. Naviant, Inc., 844 So. 2d 792 (Fla. 4th DCA 2003) (finding no legitimate business interest based on training where employees had

prior experience in making cold call sales and testified that the company's sales tactics were generic). Additionally, Concrete's assertion of relationships with Sam's Club and Wal-Mart—also, as noted by Defendants, not pleaded—is unavailing because there is no evidence of a relationship with Sam's Club or Wal-Mart, especially considering the layers of contractors in between the floor-repair subcontractors and these retailers.

In sum, in addition to failing to establish a substantial likelihood of success on the merits of its claim of violation of the Agreement, Concrete has failed to establish a "legitimate business interest" rendering the Agreement enforceable in any event. For this reason also, Concrete is not entitled to preliminary injunctive relief.

### III.  Conclusion

As set forth above, Concrete has not established entitlement to preliminary injunctive relief. Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1.  Plaintiff's Motion for Preliminary Injunction (Doc. 17) is **DENIED**.

2.  Plaintiff's Motion for Emergency Preliminary Injunction (Doc. 6) is **DENIED as moot**.

**DONE** and **ORDERED** in Orlando, Florida this 13th day of May, 2010.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record